## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Action No.   21-cr-00006-RM

UNITED STATES OF AMERICA,

     Plaintiff,

v.

**1.    EPSILON DATA MANAGEMENT, LLC,**

     Defendant.

**FILED**
**UNITED STATES DISTRICT COURT**
**DENVER, COLORADO**
*10:10 am, Jan 19, 2021*
**JEFFREY P. COLWELL, CLERK**

---

## INFORMATION

---

The United States charges:

## COUNT ONE

1.    Between no later than in or around July 2008 and continuing until in or around July 2017, in the State and District of Colorado and elsewhere, defendant

## EPSILON DATA MANAGEMENT, LLC

did knowingly combine, conspire, confederate, and agree with other persons, known and unknown to the grand jury, to commit mail fraud, in violation of Title 18, United States Code, Section 1341, and wire fraud, in violation of Title 18, United States Code, Section 1343.

## **GENERAL ALLEGATIONS**

2.      From approximately July 2008 through July 2017 ("the Relevant Time Period"),

Epsilon Data Management, LLC ("Epsilon") was a Delaware limited liability corporation

and subsidiary of Alliance Data Systems Corporation.

3.      Epsilon was one of the largest marketing companies in the world.  During the

Relevant Time Period, Epsilon was organized into five lines of business or practices.

Epsilon's data practice collected consumer data and employed sophisticated data

modeling to assist its clients with identifying new potential customers and obtaining new

information about the clients' existing customers.  In particular, Epsilon's data practice

used models that analyzed a client's transactional data (i.e., the records of clients'

interactions with consumers) along with the data of other clients to identify targeted lists

of consumers likely to respond to the client's marketing campaigns and solicitations.

Epsilon's data practice possessed data on millions of households in the United States

and served a client base of about 2,000 clients at any given time.

4.      The Direct to Consumer Unit (the "DTC Unit") was a small unit in Epsilon's data

practice that specialized in serving clients that advertised and sold products by sending

solicitations to consumers through the mail.  The DTC Unit generated approximately 1

percent of Epsilon's annual revenue during the Relevant Time Period.

5.      Employee A helped to create the DTC Unit and managed it from 2006 to 2011.

From 2011 to 2017, Employee A served in a senior sales management role at Epsilon,

having oversight and policy-making responsibility for the DTC Unit.

6.      Employee B served as an account executive in the DTC Unit from 2008 to 2011, working to model data for clients.  From 2011 to the end of the Relevant Time Period, Employee B managed the DTC Unit.

7.      Employee C worked as a business-development manager responsible for soliciting clients for the DTC Unit from 2012 to the end of the Relevant Time Period.

8.      Employee D served as an account executive in the DTC Unit from 2010 to 2015. From 2015 to the end of the Relevant Time Period, Executive D worked as a business-development manager responsible for soliciting clients for the DTC Unit.

9.      Employees A, B, C, and D (collectively, the "Employees") all resigned or were separated from Epsilon.

### MANNER AND MEANS

10.      During the Relevant Time Period, the DTC Unit's clients included a number of entities and individuals that sent mailings to consumers with deceptive solicitations, including sweepstakes, astrology, auto-warranty, dietary-supplement, and government-grant offers.  Epsilon employees, including the Employees, referred to consumers targeted by these solicitations as "opportunity seekers," and the clients who sent such solicitations as "opportunistic."  "Opportunity seekers" frequently fell within the same demographic pool: elderly and vulnerable Americans.

11.      During the Relevant Time Period, the Employees and certain other employees working within the scope of their employment in the DTC Unit arranged for Epsilon to sell consumer data to dozens of "opportunistic" clients they knew were engaged in fraud.  The consumer data sold to the fraudulent clients came both from other

"opportunistic" clients and legitimate business, non-profit, and charitable-organization clients, including clients with many elderly customers and members.

12.     Due to their regular interaction with the fraudulent "opportunistic" clients, the Employees were familiar with the clients' practices, as well as their deceptive solicitations.  The Employees worked to develop and increase business with clients engaged in fraud despite receiving notice that those and similar clients had been arrested, charged with crimes, convicted, and otherwise were subject to law enforcement actions for engaging in misleading practices.  The Employees engaged in this conduct, in part, to benefit Epsilon, to enrich themselves through sales-based compensation, and to enable the fraudulent clients to solicit new consumers.

13.     The DTC Unit's development of business relationships with clients engaged in fraud also enhanced Epsilon's ability to model consumer data to develop potential customer lists for legitimate clients.

14.     Many of the DTC Unit's fraudulent clients operated "astrology" schemes.  The mail solicitations sent by these schemes promised that a "psychic" had an individualized vision about each mail recipient and offered purportedly personalized astrological services or unique, supernatural objects in exchange for a fee.  In reality, the mailings were mass-produced and victims submitting money in response to the mailings received nothing of material value in return.

15.     Client 1 was an "astrology" fraudulent client of the DTC Unit.

         a.  Client 1 became a DTC Unit client in or about July 2008.  Employee A developed Client 1 as a client, and Employee B initially worked as its account executive.  Later, after Employee B assumed direct

management of the DTC Unit, Employee C engaged in work related to Client 1.

b.  Client 1 solicited payment from consumers through fraudulent mass mailings that appeared to be personal communications to the consumers from a world-renowned psychic.  These solicitations were fraudulent because they actually were non-personal form letters mass mailed to tens of thousands of consumers.

c.  Despite the obviously false nature of Client 1's solicitations, the DTC Unit maintained Client 1 as a client for years.   Indeed, the Employees and the DTC Unit stopped working with Client 1 only after a federal court enjoined it from engaging in mail fraud in November 2014.  Responding to the entry of that injunction, Employee B wrote to Employees A, C, and D that Client 1 "brought us rev[enue] for 5 years but the law caught up with them and shut them down."

d.  Even after the Employees knew of Client 1's court-ordered closure, they sought to monetize the value of consumer data obtained from Client 1.  In or around October 2015, for instance, Employee C offered a prospective client consumer-data modeling services using Client 1's victim list, apprising the prospective client that Client 1 "got popped in Q2 of this year."  In February 2016, Employees B and C also collaborated on a model for clients engaged in fraud that used data from Client 1.

     e.  In total, the DTC Unit furnished hundreds of thousands of consumers' information to Client 1 to facilitate its fraudulent mail campaign, and the DTC Unit used Client 1's data to further other fraudulent clients' schemes.

16.     The DTC Unit also provided potential victim information to a number of mass-mailing fraud schemes that sent "sweepstakes" solicitations to thousands of consumers, stating that the consumers had won a large prize.  The solicitations claimed that, to collect the promised prize, a recipient consumer needed to remit a small processing fee.  In reality, victims who paid the fee received nothing of value and were subjected to a barrage of additional solicitations making similar false promises.

17.     Client 2 was a fraudulent "sweepstakes" client of the DTC Unit.

     a.  In April 2017, following significant law enforcement actions in 2016 against fraudulent "opportunistic" clients of the DTC Unit, Client 2 approached Employees C and D, seeking data on thousands of consumers for a sweepstakes mailing campaign.  Both Employees C and D received a copy of Client 2's sample solicitation, and Employee C forwarded it to Employee B.  Like other sweepstakes solicitations of clients the Employees knew had been subject to recent law enforcement actions, Client 2's sample solicitation was designed to resemble an "official" notice that the consumer receiving the solicitation had won millions of dollars in a sweepstakes cash prize and needed only to pay a relatively small fee to receive the prize.  The solicitation was fraudulent on its face

because Client 2 was seeking to send it to thousands of consumers and it was impossible for all those consumers to have won the promised cash prize. Nevertheless, the Employees facilitated the signing of Client 2 as a client.

b. Shortly after Client 2 was signed as a client, Employee C commented on red flags of fraud associated with Client 2 to Employee B, including that Client 2's contact email accounts were "@gmail handles" (indicating that Client 2 had no corporate email address), Client 2's listed physical address was a private mail box, and Client 2's corporate name had only been registered within the last sixty days and yet Client 2 claimed already to have more than 178,000 customers. Employee C wrote to Employee B that, because of these red flags, "[w]e have to be careful, but I think they will mail aggressively." Employee C also instructed the account executive assigned to Client 2 to "keep them on a short (receivables) leash" to ensure that Epsilon would not lose too much money if Client 2 were shut down. The DTC Unit sold a list of 5,000 consumers to Client 2 in May, 2017.

c. On or about July 19, 2017, a representative of Client 2 informed Employee C that Client 2 had stopped mailing solicitations. In response, Employee B responded via email: "Crazy they wanted to join so recently!" Employee C replied that "[t]hat first mailing must have really 'not met their [return-on-investment] expectations.' Or

they went to jail.  It's all the same."  Shortly thereafter, a
representative of Client 2 requested additional consumer data from
Epsilon, and the DTC Unit arranged for Client 2 to receive a list of
another 24,000 consumers.

18.     During the Relevant Time Period, Epsilon's DTC Unit sold data associated with
more than 30 million American consumers to clients engaged in fraudulent mass-
mailing schemes.

All in violation of Title 18, United States Code, Section 1349.

## **FORFEITURE ALLEGATION**

### **18 U.S.C. § 981(a)(1)(C), 28 U.S.C. § 2461(c)**

19.     Upon conviction of the offense alleged in Count One, defendant shall forfeit to
the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and
Title 28, United States Code, Section 2461(c), any property, real or personal,
constituting, or derived from, proceeds obtained directly or indirectly as a result of such
offense.

20.     Because the property described above as being subject to forfeiture as a result of
any act or omission of the defendant-

> (1)   cannot be located upon the exercise of due diligence;
>
> (2)   has been transferred or sold to, or deposited with, a third person;
>
> (3)   has been placed beyond the jurisdiction of the Court;
>
> (4)   has been substantially diminished in value, or
>
> (5)   has been commingled with other property which cannot be subdivided
> without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28 United States Code Section 2461, to seek forfeiture of any other property of said defendant up to the value of said property listed above as being subject to forfeiture.

Dated: January 15, 2021.


JASON R. DUNN
United States Attorney


By: _____
Hetal Doshi
Rebecca S. Weber
Assistant United States Attorneys
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
(303) 454-0103 (Doshi)
(303) 454-0332 (Weber)
Hetal.Doshi@usdoj.gov
Rebecca.Weber@usdoj.gov
Attorneys for the United States

GUSTAV W. EYLER
Director
Consumer Protection Branch
United States Department of Justice

By: _____
Alistair Reader
Ehren Reynolds
Trial Attorneys
Consumer Protection Branch
United States Department of Justice
450 5th Street, NW, Suite 6400
Washington, DC 20530
(202) 353-9930 (Reader)
(202) 598-8339 (Reynolds)
Alistair.F.Reader@usdoj.gov
Ehren.Reynolds@usdoj.gov
Attorneys for the United States