# **<u>EXHIBIT 1</u>**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**CASE NO.** _____

**UNITED STATES OF AMERICA,**

          **Plaintiff,**

**v.**

**1.**     **EPSILON DATA MANAGEMENT, LLC,**

          **Defendant.**

_____

**DEFERRED PROSECUTION AGREEMENT**

Defendant Epsilon Data Management, LLC ("Epsilon" or "the Company"), by its undersigned representatives, pursuant to authority granted by its Chief Executive Officer, reflected in Attachment A, and the United States Department of Justice Consumer Protection Branch and the United States Attorney's Office for the District of Colorado (collectively, "the Government") enter into this deferred prosecution agreement ("the Agreement"), the terms and conditions of which are as follows:

**Criminal Information and Acceptance of Responsibility**

1.     Epsilon acknowledges and agrees that the Government will file a one-count criminal Information in the United States District Court for the District of Colorado charging Epsilon with one count of Conspiracy to Commit Mail and Wire Fraud in violation of Title 18, United States Code, Section 1349, arising out of the conduct described in the Statement of Facts, attached hereto as Attachment B and incorporated

1

by reference into this Agreement ("Covered Conduct").  In so doing, Epsilon: (a) knowingly waives its right to indictment on this charge, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); (b) knowingly waives for purposes of this Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts any objection with respect to venue in the United States District Court for the District of Colorado; and (c) consents to the filing of the Information.  The Government agrees to defer prosecution of Epsilon pursuant to the terms and conditions described below.

2.      Epsilon admits, accepts, and acknowledges that it is responsible under United States federal law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate.  Should the Government pursue the prosecution that is deferred by this Agreement, Epsilon stipulates to the admissibility of the Statement of Facts in any proceeding, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the Statement of Facts at any such proceeding.

## **Term of the Agreement**

3.      This Agreement is effective for a period beginning on the date on which the Information is filed (the "Effective Date") and ending thirty months after that date (the "Term").  Epsilon agrees, however, that, in the event the Government determines, in its sole discretion, that Epsilon has knowingly violated any material provision of this

Agreement, or has failed to completely perform or fulfill each of Epsilon's obligations under this Agreement, an extension or extensions of the Term may be imposed by the Government, in its sole discretion, for up to a total additional time period of six months, without prejudice to the Government's right to proceed as provided in Paragraphs 24-29 below.  Any extension of the Term extends all terms of this Agreement, including the terms of the Compliance Measures in Attachment C for an equivalent period.  In the event the Government determines that an extension of the Term is or may be warranted, the Government will notify  Epsilon in writing of its determination no later than sixty days prior to the expiration of the Term.  Within thirty days of receipt of that notice, Epsilon may respond to the Government in writing to explain the nature and circumstances of any alleged breach, as well as the actions Epsilon has taken to address and remediate the situation, including whether Epsilon believes a breach occurred, whether such breach was material, and whether such breach was knowingly or willfully committed.  The Government agrees to consider such explanation in determining whether to extend the Term.  Conversely, in the event the Government finds, in its sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the reporting requirement in Attachment D, and that the other provisions of this Agreement have been satisfied, the Agreement may be terminated early.

### Relevant Considerations

4.     The Government enters into this Agreement based on the individual facts and circumstances presented by this case and Epsilon, including:

a.    Epsilon did not receive voluntary disclosure credit;

b.    Epsilon received full credit for its extensive cooperation with the investigation conducted by the Government, including conducting a thorough and expedited internal investigation, making regular factual presentations to the Government, voluntarily making employees available for interviews, and collecting, analyzing, and organizing voluminous evidence and information for the Government;

c.    Epsilon provided the Government all relevant facts known to it, including information about the individuals involved in the Covered Conduct, and assisted the Government in understanding the complexities of its industry and data practices;

d.    Epsilon engaged in significant remedial measures, including that:

i.   Epsilon separated employees known to Epsilon to have been involved in the Covered Conduct;

ii.  Epsilon terminated business relationships with marketers and brokers known to have been involved in the Covered Conduct or that sent out false or deceptive mail solicitations to consumers, including solicitations seeking payment associated with falsely or unlawfully promised prizes, personalized psychic services, automobile warranties, cures and treatments, and grant opportunities;

4

      iii.  Epsilon dissolved its Direct to Consumer business unit as a result of that unit's involvement in the Covered Conduct; and

      iv.  Epsilon has made substantial investments in staffing and resources for its legal and compliance teams; updated policies, procedures, and supervisory structures with an emphasis on detecting, and preventing the sale of consumer data to current clients and prospective clients proposing to engage in potentially fraudulent and deceptive marketing campaigns; and expanded employee training;

e.     Epsilon has substantially enhanced, and has committed to continuing to enhance, its compliance program and internal controls, including through its engagement of an outside compliance expert, to ensure that they satisfy the elements set forth in Attachment C to this Agreement (Corporate Compliance Program), thereby safeguarding the integrity and proper use of consumer data;

f.     based on Epsilon's remediation and the state of its compliance program, the fact that the Covered Conduct concluded in 2017, and Epsilon's agreement to report to the Government as set forth in Attachment D to this Agreement (Corporate Compliance Reporting), the Government determined that an independent compliance monitor was unnecessary;

g.      the nature and seriousness of the Covered Conduct;

h.      Epsilon has no prior criminal history; and

i.      Epsilon has agreed to continue to cooperate with the Government
        as set forth in Paragraph 5 of this Agreement.

### Future Cooperation and Disclosure Requirements

5.      Epsilon shall cooperate fully with the Government in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts, and other conduct under investigation by the Government, until the later of the date upon which all investigations and potential prosecutions arising out of such conduct are concluded or the end of the Term of this Agreement.  At the request of the Government, Epsilon shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies in any investigation of Epsilon, its parent company or its affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any matters relating to the conduct described in this Agreement, the attached Statement of Facts, and other conduct under investigation by the Government.  Epsilon's cooperation pursuant to this paragraph is subject to applicable law and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, Epsilon must provide to the Government a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and Epsilon bears the burden of establishing the validity of any such assertion.  Epsilon agrees that its cooperation pursuant to this paragraph shall include, but not be limited to, the following:

6

a.     Epsilon shall truthfully disclose all factual information with respect to its activities, those of its parent company and affiliates, and those of its former, present and future directors, officers, employees, agents, business partners, brokers, and clients, including any evidence or allegations and internal or external investigations, about which Epsilon has any knowledge or about which the Government may inquire.  This obligation of truthful disclosure includes, but is not limited to, the obligation of Epsilon to provide to the Government, upon request, any document, record or other tangible evidence about which the Government may inquire of Epsilon;

b.     Upon request of the Government, Epsilon shall designate knowledgeable employees, agents or attorneys to provide to the Government the information and materials described in Paragraph 5(a) above on behalf of Epsilon.  It is further understood that Epsilon must at all times provide complete, truthful, and accurate non-privileged information;

c.     Epsilon shall use its best efforts to make available for interviews or testimony, as requested by the Government, former, present and future officers, directors, employees, agents and consultants of Epsilon.  This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as

7

interviews with law enforcement and regulatory authorities.
Cooperation under this paragraph shall include identification of
witnesses who, to the knowledge of Epsilon, may have material
information sought by the Government;

d.      With respect to any information, testimony, documents, records or
other tangible evidence provided to the Government pursuant to
this Agreement, Epsilon consents to any and all disclosures,
subject to applicable law and regulations, to other domestic and
foreign law enforcement and regulatory authorities of such
materials as the Government, in its sole discretion, shall deem
appropriate; and

e.      Epsilon will promptly report to the Government identified violations
of federal law, or investigations of such violations, involving Epsilon
or any of its directors, officers, employees, or agents acting within
the scope of their employment.

6.      On the date that the period of deferred prosecution specified in this
Agreement expires, Epsilon, by its Chief Executive Officer of the Company, will certify to
the Government that it has met its disclosure obligations pursuant to Paragraph 5 of this
Agreement.  The certification will be deemed a material statement and representation
by the Company to the executive branch of the United States for purposes of Title 18,
United States Code, Sections 1001 and 1519, and it will be deemed to have been made
in the judicial district in which this Agreement is filed.

**Total Criminal Monetary Amount**

7.      The Government and Epsilon agree that the Total Criminal Monetary Amount to be paid by Epsilon pursuant to this Agreement is $150,000,000, which is comprised of the following components set forth below:  (1) a Criminal Monetary Penalty in amount of $22,500,000; and (2) a Victim Compensation Amount of $127,500,000.

8.      As a result of the Covered Conduct described in the attached Statement of Facts, the parties agree that the Government could institute a civil and/or criminal forfeiture action against certain funds held by Epsilon and that such funds would be forfeitable under the civil and criminal federal asset forfeiture laws.  Notwithstanding this agreement, the Government is not requiring Epsilon to pay a criminal forfeiture amount under this Agreement.  The Government agrees that this disposition is appropriate because of Epsilon's agreement to pay the Victim Compensation Amount, as well as the facts and circumstances of this case, including the Relevant Considerations described in Paragraph 4 of this Agreement.  The parties agree that the Government may pursue civil and criminal forfeiture in the event of a breach of this Agreement and subsequent prosecution.

9.      Epsilon acknowledges that no tax deduction may be sought in connection with the payment of any of the components of the Total Criminal Monetary Amount.

**Payment of Criminal Monetary Penalty**

10.      The Government and Epsilon agree that application of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines") to determine the

applicable fine range yields the following analysis:

    a.    The 2018 USSG are applicable to this matter.

    b.    <u>Offense Level</u>.  Based upon USSG § 2B1.1, the total offense level is 31, calculated as follows:

| (a)(1) | Base Offense Level | 7 |
|---|---|---|
| (b)(1)(L) | Loss more than $25,000,000 | +22 |
| (b)(2)(A) | Victim enhancement | +2 |
| **Total** | | **31** |

    c.    <u>Base Fine</u>.  Based upon USSG § 8C2.4(a)(1), the base fine is $25,000,000 (the fine indicated in the Offense Level Fine Table)

    d.    <u>Culpability Score.</u>  Based upon USSG § 8C2.5, the culpability score is 6, calculated as follows:

| (a) | Base Culpability Score | 5 |
|---|---|---|
| (b)(3)(B) | Involvement in/Tolerance of Criminal Activity | +3 |
| (g)(2) | Cooperation and Acceptance of Responsibility | -2 |
| **Total** | | **6** |

    e.    <u>Calculation of Fine Range</u>

| Base Fine | $25,000,000 |
|---|---|
| Multipliers | 1.2 (min)/ 2.4 (max) |
| Fine Range | $30,000,000/ $60,000,000 |

11.    Epsilon agrees to pay a criminal monetary penalty ("the Criminal Monetary Penalty") in the amount of $22,500,000 (representing a reduction below the Sentencing Guidelines range based on Epsilon's substantial cooperation) to the United States Treasury in two equal payments, with the first payment occurring not more than 10 days

after the signing of this agreement, and the second payment occurring no later than January 31, 2022, pursuant to payment instructions provided by the Government in its sole discretion.  Epsilon and the Government agree that the Criminal Monetary Penalty is appropriate given the facts and circumstances of this case, including the Relevant Considerations described in Paragraph 4 of this Agreement, as well as the amount Epsilon agrees to pay in victim compensation, as described in Paragraphs 13-15 of this Agreement.

12.     The Criminal Monetary Penalty is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Government that $22,500,000 is the maximum fine that may be imposed in any future prosecution, and the Government is not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Government agrees that under those circumstances, it will recommend to the Court that any amount paid as part of the Criminal Monetary Penalty should be offset against any fine the Court imposes as part of a future judgment.

## Payment of Victim Compensation Amount

13.     Epsilon agrees to pay the amount of $127,500,000 to compensate victims for losses from fraudulent mass-mailing schemes operated by individuals who acquired consumer data from Epsilon, as described in the attached Statement of Facts ("the Victim Compensation Amount").  Epsilon shall pay the Victim Compensation Amount to the United States in two equal payments, with the first payment occurring not more than 10 days after the signing of this agreement, and the second payment occurring no

11

later than January 31, 2022, pursuant to payment instructions provided by the Government in its sole discretion.

14.     Epsilon agrees to bear the cost of the administration of all victim claims by a third-party claim administrator ("Claim Administrator") who will report directly to the Government.  Epsilon may select the Claim Administrator subject to the approval of the Government, and Epsilon must submit its selection no later than forty-five days after the signing of this Agreement.  Epsilon further agrees to provide the Claim Administrator with full access to the books and records of Epsilon and all subsidiaries and affiliates as necessary for the Claim Administrator to compensate victims.

15.     Epsilon agrees that any unclaimed part of the Victim Compensation Amount remaining at the end of the Term shall revert to the United States in the form of a payment to the United States Postal Inspection Service Consumer Fraud Fund.

## Conditional Release from Liability

16.     Subject to Paragraphs 24-27 below, the Government agrees, except as provided in this Agreement, that it will not bring any criminal case against Epsilon relating to any of the Covered Conduct.  The Government, however, may use any information related to the Covered Conduct against Epsilon:  (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

12

17.     This Agreement does not provide any protection against prosecution for any future conduct by Epsilon.

18.     In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with Epsilon.

### Corporate Compliance Program

19.     Epsilon represents that it has implemented and will continue to implement a compliance and ethics program designed to detect and prevent the transfer or sale of consumer data to entities and individuals engaged in fraudulent and deceptive marketing campaigns, and related violations of federal law, throughout its operations, including those of its affiliates, agents, and joint ventures (to the extent that the Company manages or controls such joint ventures), and those of its contractors and subcontractors, including, but not limited to, the elements set forth in Attachment C of this Agreement.

20.     To address any deficiencies in its internal controls, policies, and procedures, Epsilon represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing controls, policies, and procedures regarding the responsible acquisition, possession, transfer, use, and sale of consumer data.  Where necessary and appropriate, Epsilon agrees to adopt a new compliance program, or to modify its existing one, including internal controls, compliance policies, and procedures to ensure that it maintains an effective compliance program, including a system of internal controls designed to effectively detect and deter violations of federal law associated with the

acquisition, possession, transfer, use, and sale of consumer data.  The compliance program, including the internal controls system, will include, but not be limited to, the elements set forth in Attachment C of this Agreement.

## Corporate Compliance Reporting

21.     Epsilon agrees that it will report to the Government annually during the Term of this Agreement regarding remediation and implementation of the compliance measures described in Attachment C of this Agreement.  These reports will be prepared in accordance with Attachment D of this Agreement.

## Deferred Prosecution

22.     In consideration of the undertakings agreed to by Epsilon in this Agreement, the Government agrees that any prosecution of Epsilon for the Covered Conduct described in the attached Statement of Facts is hereby deferred for the Term of this Agreement.

23.     The Government further agrees that if Epsilon fully complies with all of its obligations under this Agreement, the Government will not continue the criminal prosecution against Epsilon described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire.  Within thirty days of this Agreement's expiration, the Government shall seek dismissal with prejudice of the criminal Information filed against Epsilon described in Paragraph 1, and agrees not to file charges in the future against Epsilon based on the Covered Conduct described in the attached Statement of Facts.

## **Breach of the Agreement**

24.     If, during the Term of this Agreement, Epsilon (a) commits any felony under United States federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information; (c) fails to cooperate as set forth in Paragraph 5 of this Agreement; (d) fails entirely to implement a compliance measure as set forth in Paragraphs 19-20 of this Agreement and Attachment C (as distinct from a failure to effectively perform a compliance measure subject to Stipulated Damages as set forth in Paragraph 28 of this Agreement); or (e) otherwise materially fails to perform or fulfill its obligations under this Agreement, Epsilon shall thereafter be subject to prosecution for any federal criminal violation of which the Government has knowledge, including, but not limited to, the charge in the Information described in Paragraph 1, which may be pursued by the Government in the United States District Court for the District of Colorado or any other appropriate venue.  Determination of whether Epsilon has materially breached the Agreement and whether to pursue prosecution of Epsilon shall be in the Government's sole discretion and is not subject to review in any court or tribunal.  Any such prosecution may be premised on information provided by Epsilon.  Any such prosecution relating to the Covered Conduct or relating to conduct associated with the Covered Conduct and known to the Government before the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against Epsilon, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year.  Thus, by

15

signing this Agreement, Epsilon agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year.

25.     In the event the Government determines that Epsilon has materially breached this Agreement, the Government agrees to provide Epsilon with written notice of such breach before instituting any prosecution resulting from such breach.  Within thirty days of receipt of such notice, Epsilon shall have the opportunity to respond to the Government in writing to explain the nature and circumstances of such breach, as well as the actions Epsilon has taken to address and remediate the situation, which explanation the Government shall consider in determining whether to pursue prosecution of the Company.

26.     In the event the Government institutes a prosecution due to Epsilon's material breach of this Agreement:  (a) all statements made by or on behalf of Epsilon to the Government or to the Court, including the attached Statement of Facts, and any testimony given by Epsilon before a grand jury, a court, or any tribunal, or at any legislative hearings, whether before or after this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Government against Epsilon, provided such statements or testimony are otherwise admissible under the Federal Rules of Evidence, except for the attached Statement of Facts, which is admissible in whole; and (b) Epsilon shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal

rule that any such statements or testimony made by or on behalf of Epsilon before or after this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible.  The decision whether conduct or statements of any present or future director, officer or employee, or any person acting on behalf of, or at the direction of, Epsilon, will be imputed to Epsilon for the purpose of determining whether Epsilon has violated any provision of this Agreement shall be in the sole discretion of the Government.

27.     Epsilon acknowledges that the Government has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if Epsilon materially breaches this Agreement and this matter proceeds to judgment. Epsilon further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

## Stipulated Damages

28.     Epsilon and the Government agree that the Government, in its sole discretion, may impose damages ("Stipulated Damages") for any failure by Epsilon to effectively perform an obligation set forth in Paragraphs 19 or 20 of this Agreement or Attachment C (collectively, the "Compliance Measures").  Stipulated Damages shall be calculated as ten thousand dollars ($10,000) total per day if Compliance Measures are not effectively performed, and will be assessed as follows:

a.     Upon the Government's determination that Epsilon has failed to effectively perform a Compliance Measure, the Government shall notify Epsilon in

writing of its failure and the Government's exercise of its contractual right to demand payment of the Stipulated Damages (the "Demand Letter"). The Demand Letter shall set forth:

i.      The Compliance Measure(s) that Epsilon has failed, in the Government's determination, to effectively perform;

ii.     The date on which Epsilon first failed, in the Government's determination, to effectively perform the Compliance Measure(s);

iii.    A description of Compliance Measure(s) not met sufficient to permit Epsilon to cure (as described below); and

iv.     the amount of Stipulated Damages claimed by the Government as of the date of the Demand Letter.

b.      Within thirty (30) days after receipt of the Demand Letter, or such other period as the Government may agree in writing, Epsilon shall cure its failure to effectively perform the Compliance Measure(s) identified by the Government in the Demand Letter ("Cure Period").  If the failure is of a type that can be cured and Epsilon cures the failure within the Cure Period, no Stipulated Damages shall be due.  If Epsilon does not cure the failure during the Cure Period, but Epsilon then subsequently cures the failure, Stipulated Damages calculated from the date on which Epsilon first failed to effectively perform the Compliance Measure(s) to the date of cure shall be immediately payable to the Government.  If the failure is one that cannot be cured, then Stipulated Damages calculated from the date on

18

which Epsilon first failed to effectively perform the Compliance Measure(s) until the date that Epsilon remediates the failure to the Government's satisfaction shall be immediately payable to the Government.

c.      Determination of whether Epsilon has failed to effectively perform a Compliance Measure shall be in the Government's sole discretion. Determinations of whether a failure to effectively perform a Compliance Measure can be cured or has been cured, and determinations of when a failure has been cured or remediated shall all be in the Government's sole discretion.

d.      The Stipulated Damages shall be paid by electronic fund transfer according to wire transfer instructions that will be provided by the Government.

e.      Epsilon agrees that the United States District Court for the District of Colorado shall have jurisdiction over any action to collect Stipulated Damages.

f.      If Epsilon fails timely to make a required payment of Stipulated Damages, interest (at the rate specified in 28 U.S.C. § 1961) shall accrue on the unpaid balance through the date of payment.

**Sale, Merger, or Other Change in Corporate Form of Epsilon**

29.      Except as may otherwise be agreed by the parties in connection with a particular transaction, Epsilon agrees that in the event that, during the Term, it undertakes any change in corporate form, including if it sells, merges, or transfers

19

business operations that are material to Epsilon's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.  The purchaser or successor in interest must also agree in writing that the Government's ability to declare breach under this Agreement is applicable in full force to that entity.  Epsilon agrees that the failure to include these provisions in the transaction will make any such transaction null and void.  Epsilon shall provide notice to the Government at least thirty days prior to undertaking any such sale, merger, transfer, or other change in corporate form.  The Government shall notify Epsilon prior to such transaction (or series of transactions) if it determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement.  If, at any time during the Term, Epsilon engages in a transaction that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Government may deem it a breach of this Agreement pursuant to Paragraphs 24-27 of this Agreement.  Nothing in this Agreement shall restrict Epsilon from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the

effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Government.

## Public Statements by Epsilon

30.     Epsilon expressly agrees that it shall not, through present or future attorneys, officers, directors, agents, management level employees or any other person authorized to speak for Epsilon, make any public statement, in litigation or otherwise, contradicting in whole or in part the acceptance of responsibility by Epsilon set forth above or the facts described in the attached Statement of Facts.  Any such contradictory statement shall, subject to cure rights of Epsilon described in this paragraph below, constitute a material breach of this Agreement, and Epsilon thereafter shall be subject to prosecution as set forth in this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the Statement of Facts will be imputed to Epsilon for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Government.  If the Government determines that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Government shall so notify Epsilon, and Epsilon may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification.  Epsilon shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Statement of Facts.  No statement made by any former, present or future officer, director, employee, or agent of

Epsilon in the course of any criminal, regulatory, or civil case initiated against such individual shall be imputed to Epsilon, unless such individual is speaking on behalf of Epsilon.

31.     Epsilon agrees that if it or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, Epsilon shall first consult with the Government to determine: (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Government and Epsilon; and (b) whether the Government has any objection to the release.

32.     The Government agrees, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of Epsilon's cooperation and remediation.  By agreeing to provide this information to such authorities, the Government is not agreeing to advocate on behalf of Epsilon, but rather is agreeing to provide facts to be evaluated independently by such authorities.

### Limitations on Binding Effect of Agreement

33.     This Agreement is binding on Epsilon and the Government (again defined as the U.S. Department of Justice's Consumer Protection Branch and the U.S. Attorney's Office for the District of Colorado, collectively) but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Government will bring the cooperation of Epsilon and its compliance with

its other obligations under this Agreement to the attention of such agencies and

authorities if requested to do so by Epsilon.  The Government and Epsilon agree that, if

the Court rejects the Agreement, all provisions of the Agreement shall be deemed null

and void, and the Term of the Agreement shall be deemed to have not yet begun.

### Notice

34.     Any notice to the Government under this Agreement shall be given by

personal delivery, overnight delivery by a recognized delivery service, or registered or

certified mail, addressed to:

> Director, Consumer Protection Branch
> Civil Division
> U.S. Department of Justice
> 450 5th Street NW, Room 6400 South
> Washington, DC 20001
>
> Chief, Criminal Division
> U.S. Attorney's Office
> District of Colorado
> 1801 California Street, Ste 1600
> Denver, CO 80202

35.     Any notice to Epsilon under this Agreement shall be given by personal

delivery, overnight delivery by a recognized delivery service, or registered or certified

mail, addressed to:

> Epsilon Data Management, LLC
> C/o:  General Counsel Lisa Gallerano
> 6021 Connection Blvd
> Irving, TX 75039

Shawn Cleveland, Esq.
BakerHostetler
2728 North Harwood Street | Suite 300
Dallas, TX 75201-1735

36.     Notice shall be effective upon actual receipt by the Government or

Epsilon.

## Complete Agreement

37.     This Agreement sets forth all the terms of the agreement between Epsilon

and the Government.  No amendments, modifications or additions to this Agreement

shall be valid unless they are in writing and signed by the Government, the attorneys for

Epsilon and a duly authorized representative of Epsilon.

**AGREED:**

FOR EPSILON DATA MANAGEMENT, LLC:

Date: 1-15-2021          By: _____
                              Lisa Gallerano, Esq.
                              General Counsel
                              Epsilon Data Management, LLC

Date: 1-15-2021          By: _____
                              Shawn Cleveland, Esq.
                              BakerHostetler
                              Counsel for Epsilon Data Management, LLC

24

FOR THE U.S. DEPARTMENT OF JUSTICE, CONSUMER PROTECTION BRANCH:

Date: __1 / 18 / 21__          By: _____

Gustav Eyler
*Director*
Richard Goldberg
*Deputy Director*
Alistair Reader
Ehren Reynolds
*Trial Attorneys*


FOR THE U.S. ATTORNEY'S OFFICE, DISTRICT OF COLORADO:

Date: __1/19/2021__          By:_____

Jason Dunn
*United States Attorney*
Hetal Doshi
Rebecca Weber
*Assistant U.S. Attorneys*

25

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for Epsilon Data Management, LLC (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the members of the Company. I have advised and caused outside counsel for the Company to advise the members fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the Chief Executive Officer for the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

Date: _Jan 15, 2021_

EPSILON DATA MANAGEMENT, LLC

By: _____

Chief Executive Officer

26

**CERTIFICATE OF COUNSEL**

I am counsel for Epsilon Data Management, LLC (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the Company members. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company. Further, I have carefully reviewed the terms of this Agreement with the members and the General Counsel of the Company. I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the members, is an informed and voluntary one.

Date: _1 - 15 - 2021_        By: _____

Shawn Cleveland, Esq.
BakerHostetler
Counsel for Epsilon Data Management, LLC

27

ATTACHMENT A

## CHIEF EXECUTIVE OFFICER'S CERTIFICATE

I, Bryan Kennedy, do hereby certify that I am the duly appointed and acting Chief Executive Officer of Epsilon Data Management, LLC, a limited liability company organized under the laws of Delaware ("Epsilon");

WHEREAS, Epsilon Data Management, LLC ("Epsilon") has been engaged in discussions with the United States Department of Justice, Consumer Protection Branch and the United States Attorney's Office for the District of Colorado (collectively, "the Government") regarding issues arising in connection with the use and sale of consumer data by former employees of Epsilon; and

WHEREAS, in order to resolve such discussions, it is proposed that Epsilon enter into a certain agreement with the Government; and

WHEREAS, Lisa Gallerano, General Counsel, together with outside counsel for Epsilon, have advised Epsilon of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Government;

NOW, THEREFORE, BE IT RESOLVED, that:

1. Epsilon (a) acknowledges the filing of the one-count Information charging Epsilon with Conspiracy to Commit Mail and Wire Fraud in violation of Title 18, United States Code, Section 1349 (the "Information"); (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Government ("the

Agreement"); and (c) agrees to pay a Total Criminal Monetary Amount of $150,000,000 under the Agreement with respect to the conduct described in the Information;

2.      Epsilon accepts the terms and conditions of the Agreement, including, but not limited to: (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); (b) a knowing waiver for purposes of the Agreement and any charges by the United States arising out of the conduct described in the attached Statement of Facts of any objection with respect to venue; (c) consents to the filing of the Information, as provided under the terms of the Agreement in the United States District Court for the District of Colorado; and (d) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Government prior to the date on which the Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of the Agreement; and

3.      I am authorized, empowered and directed, on behalf of Epsilon, to execute the Agreement substantially in such form with such changes as I may approve;

4.      I am authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement of other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions.


Date: Jan 15, 2021                    By: _____

Bryan Kennedy
Chief Executive Officer
Epsilon Data Management, LLC

ATTACHMENT B

**<u>STATEMENT OF FACTS</u>**

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Consumer Protection Branch and the United States Attorney's Office for the District of Colorado (collectively, "the Government") and Epsilon Data Management, LLC ("Epsilon").  Epsilon hereby agrees and stipulates that the following information is true and accurate.  Epsilon admits, accepts, and acknowledges that it is responsible under United States federal law for the acts of its officers, directors, employees, and agents as set forth below.  Should the Government pursue the prosecution that is deferred by the Agreement, Epsilon agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding.  The following facts establish beyond a reasonable doubt the charges set forth in the criminal Information attached to this Agreement:

<u>Relevant Entities and Individuals</u>

1.      From approximately July 2008 through July 2017 ("the Relevant Time Period"), Epsilon was a Delaware limited liability corporation and subsidiary of Alliance Data Systems Corporation.

2.      Epsilon was one of the largest marketing companies in the world.  During the Relevant Time Period, Epsilon was organized into five lines of business or practices.  Epsilon's data practice collected consumer data and employed sophisticated data modeling to assist its clients with identifying new potential customers and obtaining new information about the clients' existing customers.  In particular, Epsilon's data practice

used models that analyzed a client's transactional data (*i.e.,* the records of clients' interactions with consumers) along with the data of other clients to identify targeted lists of consumers likely to respond to the client's marketing campaigns and solicitations. Epsilon's data practice possessed data on millions of households in the United States and served a client base of about 2,000 clients at any given time.

3.     The Direct to Consumer Unit (the "DTC Unit") was a small unit in Epsilon's data practice that specialized in serving clients that advertised and sold products by sending solicitations to consumers through the mail.  The DTC Unit generated approximately 1 percent of Epsilon's annual revenue during the Relevant Time Period.

4.     Employee A helped to create the DTC Unit and managed it from 2006 to 2011.  From 2011 to 2017, Employee A served in a senior sales management role at Epsilon, having oversight and policy-making responsibility for the DTC Unit.

5.     Employee B served as an account executive in the DTC Unit from 2008 to 2011, working to model data for clients.  From 2011 to the end of the Relevant Time Period, Employee B managed the DTC Unit.

6.     Employee C worked as a business-development manager responsible for soliciting clients for the DTC Unit from 2012 to the end of the Relevant Time Period.

7.     Employee D served as an account executive in the DTC Unit from 2010 to 2015.  From 2015 to the end of the Relevant Time Period, Executive D worked as a business-development manager responsible for soliciting clients for the DTC Unit.

8.     Employees A, B, C, and D (collectively, the "Employees") all resigned or were separated from Epsilon.

<u>The DTC Unit's Sale of Data to Clients Engaged in Fraud</u>

9.      During the Relevant Time Period, the DTC Unit's clients included a number of entities and individuals that sent mailings to consumers with deceptive solicitations, including sweepstakes, astrology, auto-warranty, dietary-supplement, and government-grant offers.  Epsilon employees, including the Employees, referred to consumers targeted by these solicitations as "opportunity seekers," and the clients who sent such solicitations as "opportunistic."  "Opportunity seekers" frequently fell within the same demographic pool: elderly and vulnerable Americans.

10.     During the Relevant Time Period, the Employees and certain other employees working within the scope of their employment in the DTC Unit arranged for Epsilon to sell consumer data to dozens of "opportunistic" clients they knew were engaged in fraud.  The consumer data sold to the fraudulent clients came both from other "opportunistic" clients and legitimate business, non-profit, and charitable-organization clients, including clients with many elderly customers and members.

11.     Due to their regular interaction with the fraudulent "opportunistic" clients, the Employees were familiar with the clients' practices, as well as their deceptive solicitations.  The Employees worked to develop and increase business with clients engaged in fraud despite receiving notice that those and similar clients had been arrested, charged with crimes, convicted, and otherwise were subject to law enforcement actions for engaging in misleading practices.  The Employees engaged in this conduct, in part, to benefit Epsilon, to enrich themselves through sales-based compensation, and to enable the fraudulent clients to solicit new consumers.

B-3

12.     The DTC Unit's development of business relationships with clients engaged in fraud also enhanced Epsilon's ability to model consumer data to develop potential customer lists for legitimate clients.

13.     Many of the DTC Unit's fraudulent clients operated "astrology" schemes. The mail solicitations sent by these schemes promised that a "psychic" had an individualized vision about each mail recipient and offered purportedly personalized astrological services or unique, supernatural objects in exchange for a fee.  In reality, the mailings were mass-produced and victims submitting money in response to the mailings received nothing of material value in return.

14.     Client 1 was an "astrology" fraudulent client of the DTC Unit.

    a.  Client 1 became a DTC Unit client in or about July 2008.  Employee A developed Client 1 as a client, and Employee B initially worked as its account executive.  Later, after Employee B assumed direct management of the DTC Unit, Employee C engaged in work related to Client 1.

    b.  Client 1 solicited payment from consumers through fraudulent mass mailings that appeared to be personal communications to the consumers from a world-renowned psychic.  These solicitations were fraudulent because they actually were non-personal form letters mass mailed to tens of thousands of consumers.

    c.  Despite the obviously false nature of Client 1's solicitations, the DTC Unit maintained Client 1 as a client for years.   Indeed, the

B-4

Employees and the DTC Unit stopped working with Client 1 only after a federal court enjoined it from engaging in mail fraud in November 2014.  Responding to the entry of that injunction, Employee B wrote to Employees A, C, and D that Client 1 "brought us rev[enue] for 5 years but the law caught up with them and shut them down."

d.  Even after the Employees knew of Client 1's court-ordered closure, they sought to monetize the value of consumer data obtained from Client 1.  In or around October 2015, for instance, Employee C offered a prospective client consumer-data modeling services using Client 1's victim list, apprising the prospective client that Client 1 "got popped in Q2 of this year."  In February 2016, Employees B and C also collaborated on a model for clients engaged in fraud that used data from Client 1.

e.  In total, the DTC Unit furnished hundreds of thousands of consumers' information to Client 1 to facilitate its fraudulent mail campaign, and the DTC Unit used Client 1's data to further other fraudulent clients' schemes.

15.    The DTC Unit also provided potential victim information to a number of mass-mailing fraud schemes that sent "sweepstakes" solicitations to thousands of consumers, stating that the consumers had won a large prize.  The solicitations claimed that, to collect the promised prize, a recipient consumer needed to remit a small

processing fee.  In reality, victims who paid the fee received nothing of value and were subjected to a barrage of additional solicitations making similar false promises.

16.     Client 2 was a fraudulent "sweepstakes" client of the DTC Unit.

    a.  In April 2017, following significant law enforcement actions in 2016 against fraudulent "opportunistic" clients of the DTC Unit, Client 2 approached Employees C and D, seeking data on thousands of consumers for a sweepstakes mailing campaign.  Both Employees C and D received a copy of Client 2's sample solicitation, and Employee C forwarded it to Employee B.  Like other sweepstakes solicitations of clients the Employees knew had been subject to recent law enforcement actions, Client 2's sample solicitation was designed to resemble an "official" notice that the consumer receiving the solicitation had won millions of dollars in a sweepstakes cash prize and needed only to pay a relatively small fee to receive the prize.  The solicitation was fraudulent on its face because Client 2 was seeking to send it to thousands of consumers and it was impossible for all those consumers to have won the promised cash prize.  Nevertheless, the Employees facilitated the signing of Client 2 as a client.

    b.  Shortly after Client 2 was signed as a client, Employee C commented on red flags of fraud associated with Client 2 to Employee B, including that Client 2's contact email accounts were

"@gmail handles" (indicating that Client 2 had no corporate email address), Client 2's listed physical address was a private mail box, and Client 2's corporate name had only been registered within the last sixty days and yet Client 2 claimed already to have more than 178,000 customers.  Employee C wrote to Employee B that, because of these red flags, "[w]e have to be careful, but I think they will mail aggressively."  Employee C also instructed the account executive assigned to Client 2 to "keep them on a short (receivables) leash" to ensure that Epsilon would not lose too much money if Client 2 were shut down.  The DTC Unit sold a list of 5,000 consumers to Client 2 in May, 2017.

c.  On or about July 19, 2017, a representative of Client 2 informed Employee C that Client 2 had stopped mailing solicitations.  In response, Employee B responded via email: "Crazy they wanted to join so recently!"  Employee C replied that "[t]hat first mailing must have really 'not met their [return-on-investment] expectations.'  Or they went to jail.  It's all the same."  Shortly thereafter, a representative of Client 2 requested additional consumer data from Epsilon, and the DTC Unit arranged for Client 2 to receive a list of another 24,000 consumers.

B-7

17.     During the Relevant Time Period, Epsilon's DTC Unit sold data associated with more than 30 million American consumers to clients engaged in fraudulent mass-mailing schemes.

ATTACHMENT C

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns, Epsilon Data Management LLC ("Epsilon" or "the Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, reasonable and appropriate reviews of internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to modify its compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains an effective compliance program that is designed to detect and prevent the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns.  To the extent reasonable, practicable, and appropriate, this compliance program will apply to all communications channels.  The specific internal controls, compliance policies, and procedures implemented in Epsilon's lines of business may vary.   However, at a minimum, the controls, policies, and procedures in each line of business should include, but may not be limited to, the following elements, to the extent that they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

### *High-Level Commitment*

The Company has required, and will ensure on a go forward basis, that its senior management provides strong, explicit, and visible support of and commitment to its corporate policy against fraudulent or deceptive marketing by its clients and to the Company's compliance code.

### *Policies and Procedures*

Epsilon has developed or will develop and promulgate clearly articulated and visible corporate policies that prohibit it from providing data to clients engaged in fraudulent or deceptive marketing.  The policy, or policies, shall be memorialized in a written compliance code related to fraudulent or deceptive marketing by clients.

Epsilon has developed or will develop and promulgate compliance policies and procedures designed to reduce the possibility of the Company transferring or selling consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns, in violation of the Company's compliance code.  Epsilon has taken or will take measures to encourage and to support the observance of ethics and compliance policies and procedures against the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns by personnel at all levels of the Company.  These policies and procedures that are designed to detect and prevent the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns shall apply to all officers and employees.  Epsilon shall notify all employees that compliance with these policies and procedures, which are

designed to detect and prevent the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns, is the duty of individuals at all levels of the Company.    The Company will also take appropriate measures to ensure that it does not accept contractual obligations with any client, or any other party, that interfere with the Company's ability to abide by its compliance code, policies, and procedures.

Consistent with its compliance code, policies, and procedures, the Company has instituted or will institute risk-based due diligence and compliance requirements aimed at detecting and deterring the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns.    These efforts include or will include the elements of client due diligence and consumer solicitation review, at a minimum with regard to solicitations offered by mail and email in the Data Practice, using a risk-based approach and in circumstances and at intervals in which such measures are reasonable, practicable, and appropriate:

*Client Due Diligence* –

The Company will perform risk-based due diligence on a client in situations where the Company is selling or transferring consumer data to the client, or to a third-party at the direction of that client, in circumstances and at intervals where such measures are reasonable, practicable, and appropriate.    Such due diligence will include reasonable review, as necessary, of publicly available information sources, including the websites of federal enforcement authorities, that the Company determines may help to indicate whether a current or prospective client seeking consumer data for marketing purposes, or those associated with it, has been or is engaged in fraudulent or deceptive marketing to consumers.

*Consumer Solicitation Review* –

The Company also will conduct a risk-based review of consumer solicitations, or creative marketing pieces, associated with client requests to acquire the Company's consumer data for the purposes of sending a specific solicitation, in circumstances and at intervals where such measures are reasonable, practicable, and appropriate.    Solicitation review, as appropriate, may be conducted through periodic audits, the sampling of solicitations or the review of example solicitations.    To the extent practicable and reasonable, the Company has or will establish processes designed to verify that proposed consumer solicitations previously reviewed by the Company are in fact accurate representations of the solicitations actually disseminated by a client to which the Company has sold or transferred consumers' data, which may be conducted on a periodic and sample basis.

The Company's compliance program will be designed such that, during the Term of the Agreement, the Company will preserve all documents created and, to the extent practicable, all documents reviewed, while maintaining and operating its client due diligence and solicitation review program. The document preservation will be designed

to allow for reasonable auditing and assessment.  The Company will make such documents accessible, as reasonable and appropriate, to Company legal and compliance personnel and auditors.

### Periodic Risk-Based Review

The Company has developed or will develop these compliance policies and procedures on the basis of a periodic risk assessment of the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns.

Epsilon shall review its compliance code, policies, and procedures designed to detect and prevent the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns in each line of business no less than annually and shall update them as is reasonable and appropriate to ensure their continued effectiveness.

### Proper Oversight and Independence

The Company has assigned or will assign responsibility for the implementation and oversight of the Company's compliance code, policies, and procedures designed to detect and prevent the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns to one or more senior corporate executives of the Company.  Such corporate official(s) shall have the authority to report directly to the Company's Chief Executive Officer, or any other appropriate executive, and shall have an adequate level of autonomy from management, as well as sufficient resources and authority to maintain such autonomy with respect to the implementation and oversight of the compliance policies and procedures designed to detect and prevent the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns.

### Training and Guidance

The Company has implemented or will implement mechanisms designed to ensure that its compliance code, policies, and procedures designed to detect and prevent the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns are effectively communicated to all executives, officers, employees, and when necessary and appropriate, agents and business partners.  These mechanisms shall include: (a) periodic training about compliance measures designed to detect and prevent the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns for all executives, officers, and employees in positions of leadership or trust, and those that hold positions that require such training, for example, among other potential groups of employees, sales employees, employees in the legal department, and those who perform compliance functions; and (b) corresponding certifications by all such executives, officers, employees, agents, and business partners that acknowledge the training requirements related to detecting and deterring the transfer or sale of consumer data to entities and individuals engaged in

fraudulent or deceptive marketing campaigns and certify compliance with those requirements.

Epsilon will maintain, or where necessary and appropriate establish, an effective system for providing guidance and advice to executives, officers, and employees and, when necessary, agents and business partners, on abiding by the Company's compliance code, policies, and procedures relating to the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns, including when any of them need advice on an urgent or expedited basis.

### Internal Reporting and Investigation

Epsilon will maintain, or if necessary establish, an effective system for internal, and when possible, confidential reporting by, and protection of, executives, officers, employees, and when appropriate, agents and business partners, concerning the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns or violations of the Company's compliance code, policies, and procedures relating to the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns.

Epsilon will maintain, or if necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting any allegations that the Company's clients are engaged in fraudulent or deceptive marketing or are otherwise violating the Company's compliance code, policies, or procedures relating to the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns

### Enforcement and Discipline

The Company has implemented or will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures relating to the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns, including mechanisms that appropriately incentivize compliance and that discipline violations.

Epsilon has implemented or will implement appropriate disciplinary procedures to address, among other things, any employee's provision of data or services to clients engaged in fraudulent or deceptive marketing.  Such procedures shall be applied consistently and fairly, regardless of the position held by, or the perceived importance of, the subject executive, officer, or employee.  The Company has implemented or shall implement procedures to ensure that when misconduct is discovered, the Company undertakes reasonable and appropriate steps to remedy the harm that resulted from the misconduct and to ensure that reasonable and appropriate steps are taken to prevent similar misconduct from occurring in the future, including by assessing the Company's internal controls, its compliance code, policies, and procedures related to deceptive marketing by clients, and by making any necessary modifications to ensure that the Company's overall compliance program is effective.

### Consumer Rights

The Company has instituted or will institute, to the extent required by and permissible under applicable law, a reasonable process by which an individual consumer may request a copy of his or her personal information held by the Company for the purpose of the transfer or sale of data to current or prospective clients. The Company also has instituted or will institute, to the extent required by and permissible under applicable law, a reasonable process by which an individual consumer may request that the Company not sell his or her personal information to current or prospective clients.

### Mergers and Acquisitions

Epsilon has developed and implemented, or will develop and implement, policies and procedures regarding mergers and acquisitions that require the Company to conduct risk-based due diligence on potential new business entities that includes diligence regarding the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns, including appropriate due diligence by legal, accounting, and compliance personnel.

Epsilon has ensured or will ensure that its compliance code, policies, and procedures related to detecting and deterring the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns apply as quickly as is practicable to any newly acquired businesses or entities merged with the Company. Epsilon will promptly: (a) train the executives, officers, employees, and when appropriate, agents and business partners on its compliance code, policies, and procedures related to the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns; and (b) when warranted, conduct a risk-based review of newly acquired or merged businesses as quickly as is practicable regarding the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns.

### Monitoring and Testing

Epsilon will conduct periodic reviews and testing of its compliance code, policies, and procedures related to preventing and detecting the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns that are designed to evaluate and improve their effectiveness in preventing and detecting the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns and any related violations of the Company's code, policies, and procedures related to the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns. The Company's reviews and tests shall take into account relevant developments in the industry and any evolving international, domestic, and industry standards related to the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns.

Epsilon will maintain, or where necessary establish, effective processes and procedures that enable the Company, to the extent possible, to detect the transfer or sale of consumer data to entities and individuals engaged in fraudulent or deceptive marketing campaigns.

ATTACHMENT D

**REPORTING REQUIREMENTS**

Epsilon Data Management, LLC ("Epsilon") agrees that it will report to the United States Department of Justice, Consumer Protection Branch and the United States Attorney's Office for the District of Colorado (collectively, "the Government") periodically, at no more than twelve month intervals during a thirty month term (the "Term"), regarding remediation and implementation of the compliance program and internal controls, policies, and procedures described in Attachment C of this Agreement.  During this thirty month period, Epsilon shall: (1) conduct an initial review and submit an initial report, and (2) conduct and prepare at least two follow-up reviews and reports, as described below:

a.       By no later than sixty days from the date this Agreement is executed, Epsilon shall submit to the Government a written report setting forth a complete description of its remediation efforts to date, its proposals reasonably designed to improve Epsilon's internal controls, policies, and procedures to ensure that it maintains an effective compliance program, including a system of internal controls designed to effectively detect and deter violations of federal law associated with the acquisition, possession, transfer, use, and sale of consumer data, ("Federal Law") and the proposed scope of subsequent reviews.  The report shall be transmitted to:

Director, Consumer Protection Branch
U.S. Department of Justice
450 5th Street NW, Room 6400 South
Washington, DC 20001

and

Chief, Criminal Division
U.S. Attorney's Office
District of Colorado
1801 California Street, Ste 1600
Denver, CO 80202

Epsilon may extend the time period for issuance of the report with prior written approval

of the Government.

b.      Epsilon shall undertake at least two follow-up reviews and reports,

incorporating the views of the Government on Epsilon's prior reviews and reports, to

further monitor and assess whether Epsilon's policies and procedures are reasonably

designed to detect and prevent violations of Federal Law.

c.      Each follow-up review and report shall be completed by no later than 365

days after the previous report is submitted to the Government.  The final follow-up

review and report shall be completed and delivered to the Government no later than

sixty days before the end of the Term.

d.      The reports will likely include proprietary, financial, confidential, and

competitive business information.  Moreover, public disclosure of the reports could

discourage cooperation, impede pending or potential government investigations and

thus undermine the objectives of the reporting requirement.  For these reasons, among

others, the reports and the contents thereof are intended to remain and shall remain

non-public, except as otherwise agreed to by the parties in writing, or except to the

extent that the Government determines in its sole discretion that disclosure would be in furtherance of the Government's discharge of its duties and responsibilities or is otherwise required by law.

e.      Epsilon may extend the time period for submission of any of the follow-up reports with prior written approval of the Government.